Okay, the next case is Dynamic Random Access Memory Indirect Purchaser Antitrust Litigation. I see two lawyers on the screen in front of me. Please raise your hand if you can hear me. I see two hands. That means we're ready to go. We've read your briefs. We look forward to your argument. And I gather you, Mr. Berman, go first. Thank you, Your Honor. Steve Berman on behalf of the plaintiffs. I'd like to reserve three minutes for rebuttal. Okay. We're asking for the court to reverse the dismissal of the complaint that was dismissed by the district court. First, I want to start with where we are in terms of the pleading standards that should have applied to this complaint. This is, of course, a de novo review. And we have parallel conduct that the court found we adequately planned. So under the Twombly case, the issue is, have we nudged with plus factors, our claims from the conceivable to the plausible. And in answering that question, I would ask the court to keep in mind the Starr v. Baca decision. And the reason that I commend that to the court is it has two principles in it that I think are very important. One is, the court held, if there are two alternate explanations, one advanced by defendant and the other by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss. Well, you know, I love Starr v. Baca. I wrote that opinion, as you well know. But the truth is, I don't regard Starr v. Baca as the key case. I regard Twombly as the key case. And although the Supreme Court will occasionally deny that there are special pleading rules for particular kinds of cases. In fact, I think in the real world, there are special pleading rules for antitrust cases. And Twombly is the case that we really look to. That doesn't mean that you're wrong, but for me, I'll just read the introductory language from Justice Souter's opinion in Twombly. He writes, the question is whether the complaint can survive a motion to dismiss when it alleges parallel conduct, absent some factual context suggesting agreement. So the question is, what in addition to the parallel conduct do you have, and I'm just quoting the words from Twombly, that some factual context suggesting agreement. So what's the factual context that suggests agreement beyond the parallelism? So there are four plus factors, Your Honor. Actually, there's eight plus factors, as they're called. And I'm going to discuss four of them. The first is unprecedented price changes. The second is supply cuts against self-interest. The third is the vigorous public signaling between the companies that they were not going to increase output. And the fourth is completely different conduct at the end of the class period. When the Chinese regulators caught these defendants with their hands in the cookie jar, they stopped reducing supply and prices plummeted, contrary to their previous behavior. So let me start with- What about the prior price fixing? Is that a factor as well? Well, the prior price fixing, Judge White found as a plus factor. He said not a strong one. So I asked you to list plus factors, and you didn't list that one. I'm wondering why. I was going to rest on the briefs. I only have so much time, Your Honor. I think there's a variety of plus factors. I don't want to cover every one, but I want to cover what I call the big four. And I'll start with, because you pointed out, Twombly controls. And what Twombly said, and I think this is critical to this appeal, Twombly says that historically unprecedented changes in pricing structure made at the very same time by multi-competitors support a plausible inference of conspiracy. And that's exactly what we alleged here. We allege that prior to the class period in 2016, these companies were vigorously competing to gain market share. And suddenly, within a span of two months in 2016, they all cut capacity. In fact, it was so startling that one industry analyst noted, and this is at ER 035-36, that this was unprecedented. This is a person who follows the DRAM industry. The defendants admit, and this is important, Your Honor, that I'm quoting from the brief, their pricing decisions, quote, broke with historical precedent. Broke with historical precedent. Now, the GPU case, Judge Allsup, the text messaging case, Judge Posner, the standard iron works case, the clean product case, all those cases we cite have said, when there's a sudden change in pricing structure, that supports an inference of conspiracy. So that's one plus factor. And I want to mention how the court dealt with this, because I think it goes to the heart of how the court erred in looking at all of the plus factors. The court acknowledged that these reductions were, quote, historically novel. That's at ER 16. But said that didn't matter because he found an allegation in the complaint that by 2018, there were three players only in the market. And because of that, the court found there was an alternate explanation. But first of all, that was an error for two reasons. First, the complaint alleged that there was a high concentration by the DOJ HH index standards as early as 2011. So there wasn't some change in concentration that could explain the change in supply. Second, let's assume the court was correct that the change in concentration was a new fact. It's equally plausible that that change in concentration allowed collusive behavior, because there were fewer firms to coordinate with. Yes, maybe it's possible that that it also allowed rational economic behavior to be an explanation. But again, when you have two competing explanations, the tie goes to the plaintiff. So, are you aware of the optronic case that came down yesterday from this court? I am not your honor. And I apologize for that. Is there a question you would like me to try to answer. I was just going to ask you how close your allegations come to the to the evidence that was set forth in that case as being sufficient for an antitrust case. But if you if you haven't seen it, it doesn't matter. I haven't seen it. I'd be glad to submit a letter on it if you want me to. No, don't submit anything unless we ask you to please. And the second factor I'd like to get to your honors is supply cuts, contrary to self interest. The case law suggests, and I'm going to quote from the Ninth Circuit in the petroleum products case, the risk involved in leading a supply reduction suggests that purely interdependent supply decisions are unlikely. But here we know that Mike Ron stated in 2016, that it would be ill advised to move unilaterally to cut production. So they're kind of admitting that unilateral. I had counsel finish your thought that unilateral cuts are perilous but in 2016, taking migrants, hence, Samson cut production, contrary to its own self interest. At that time, demand was right. Okay, that this that the Samsung was the major player, and had the most of the market. Correct. That's correct. And they were able to control just unilaterally their own decision that if they cut supply the prices for the, these DRAMs would go up, because they'd be putting less of them in the market. So why is that not an economic decision that they could have just made. Well, they wouldn't rationally made it unless they knew others would also not gain or not supply more because doesn't that I mean the assumption that a competitor who has a much smaller market share, looking at at Samsung dropping the amount of DRMs are putting into the market to say, I will now have to increase my, my capital expenditures, add more manufacturing to try and move into that space, knowing potentially that Samsung could watch them make that investment and then go right back very easily to flooding the market with chips and they would therefore have made investment they couldn't recoup just equally have said well if they raise their price, they lower their supply, and we lower our supply we'll all make more money and and not have coercively decided that but just in this follow the leader sort of analysis, why is that economically not sound, because they would not have done it okay prior to this time that they made the cut your honor. They were all vigorously competing to gain market share. Right. And so now, Samsung is cutting its supply in a normal competitive market, both micron and hynix would have increased and gain market share. So the only reason rational reason that Samsung cut its share and it lost $47 million immediately in that quarter was if they were not going to ramp up and gain market share. And in fact, that's what happened. And the second answer to your question, your honor, is the cases say when supply cuts and this is again from the Ninth Circuit opinion in petroleum products are not quote reversible. And this is that 906 F second for 32. It is unlikely that a firm would undertake a reduction in its capacity, without some advanced agreement from competitors. And that's exactly what happened here. What seemed to have happened is that Samsung reduces capacity unilaterally. And that doesn't work. Then we get some signaling, at least under your theory of the case, and eventually, the other side understands what's being signaled. But the initial production reduction, well, it's not so much they reduce capacity and reduce production, they just don't put it on the market, but that doesn't work. So they move a little further. I mean, that's that's that's your allegation is that, well, they needed to have the signaling be a little more apparent. Well, what happened, your honor, according to the plate is first, a Samsung executive, according to our confidential witness leaked information to an analyst that Samsung was going to raise prices. That didn't work. And so then Samsung went to phase two, and they cut supply. And that worked because everyone else cut supply within a month. I see. So it was the so it was it was pricing and then supply. I got I had that's right. That's right. First, I'm not just looking at your allegations. The first move didn't work. So they had to do a little more. Yeah, that's right. They had to shift the strategy, your honor, publicly telling an analyst what you're planning on doing correspond to the idea that there's some backroom secret, we're going to all do this together in some conspiracy. Well, because if you look at the allegations, the confidential witness said this was not was typically done. There was instructions from an executive to go tell this analyst what we're going to do in pricing. Why would a competitor want to leak to the market what they're going to do in pricing unless they wanted the others to understand at least a plausible inference that looked I'll get together and do something about pricing. Why would you leak it at all? I mean, if you're the basis of your claim is they all kind of sat down in a room together and said, you know, oh, this is the plan for what we're going to do because the market for these these chips is is is just there's too many and the prices are dropping and we need to stabilize or increase the price for the market and we can do that. If they raise their prices, then in this very competitive market, they're going to lose market share. So that doesn't make sense. So instead, they just say, well, we're going to cut our supply into the market, and then there'll be more demand for less product and the price will go up. And in a market this small, I mean, how can it not make sense that everyone would follow suit? Because prior to that, again, Your Honor, they were all competing to gain market share. And there was nothing to stop the other companies from trying to get market share. But if I can make make $5, I'm just picking numbers at random, but if I can make $5 a chip and sell you 10 and still only make $5 a chip, but have to sell you sell 20, but I could make $10 a chip and only sell three, then why not sell less and make more, which is what happened? Well, because if there's a chart in the complaint that shows that there are economists drafted that shows if the others had continued to compete, they would have gained market share and made more money than they would have by all at that point, by all lowering the price of lowering supply. So your argument is that the others, instead of rushing in and taking advantage of the higher prices by keeping their low prices and gaining market share, they otherwise inexplicably reduce supplies with the result that everybody's prices go up. That's the argument? That's correct. And you mentioned, Your Honor, one of you mentioned about all getting together in a room, and Your Honor mentioned the signaling. We're not saying they got together in a room. This was a conspiracy that was carried out by public announcements. And as the judge in the broiler chicken case, for example, found, a publicly announced production cut makes it more likely that the producer has an agreement from other producers to cut production, which is exactly what happened here. Month after month, they all got in industry publications and at press conferences and said, we're doing well because we're disciplined. We have restrictions on supply. The Samsung executive said that at least three times to the market. It's plausible that these comments, restrictions on supply, discipline, it's possible that these are code words for we have an agreement. Or they are exactly that we're, we're, we're raising our prices by deciding to reduce our supply, and that the other people economically looked at that and said that makes sense we're going to do that too. But at this stage, Your Honor, with all due respect, well, the inferences are in our favor. Maybe at the end of the day, the evidence will show that. But at this stage, according to Twombly, and according to President in this circuit, we get the benefit of the inference on that issue. And I see my time is up, Your Honor, and so let's hear from the other side and we'll make sure that you get a chance to respond. Mr Simmons. Good morning, Your Honor, may it please the court Ian Simmons for appellate defendants. This court should affirm the decision below to dismiss the complaint for failure to allege facts that if true, make plausible plaintiffs claim that defendants conspired in plain sight to delay or slow capacity growth, or not to expand capacity of DRAM, rather than the oligopoly that the complaint clearly pleads. Put another way, plaintiffs plead facts showing that the DRAM industry three producers was a lawful oligopoly operating in plain sight. The complaint fails to plead facts that taken as true, make plausible any conspiracy. I'll interrupt for just a minute on the in plain sight question. The analogy may be a little remote. But if you're, say, a cards player, say a hearts player, the cooperation and agreement, I bid X, you bid Y, is in plain sight. And it's a means of signaling. It's not the two players don't get to go into the other room and compare hands, but they do get to say three no Trump. And it's in plain sight. But it is communication in order to come to an agreement. So the in plain sight by itself doesn't win the case for you. Doesn't win the case for us, Your Honor, but it clearly, as Twombly made clear as musical instruments, it's oligopoly behavior where conduct is observable. And I can decide whether or not to copy you to consciously engage in parallel conduct. I think this is what one of your members was getting at, that to copy somebody when the conduct is observable and it's in plain sight is what the Prosterman court called the gas station example. The Exxon station can see what the mobile station does and make an independent decision on whether or not to copy it, to emulate it. It's particularly troubling, this complaint, members of the court, because all of the communications occur in the context of company executives responding to analysts, financial analysts questions. The plaintiffs say the industry shrunk, they couldn't remain profitable, so you went from several down to three. So they say that. What else do they say? They shrunk in the sense of producers. The industry did not shrink in the sense of overall capacity, correct? Well, the capacity changed over time, Your Honor, but it did shrink in terms of the number. That's right, I want to make sure. It shrank in the sense that we now have three producers who at one point produced 95%, but the overall market in the terms of how much production there is goes up, correct? Well, it does over time, Your Honor, that's correct. The real grub here, and I think you were getting at this, the court, the plaintiffs explicitly and clearly plead an oligopoly, which is lawful. They do it very well, and I want to walk the court through several really vivid examples. They plead oligopoly, but they don't want the economics and the logic that comes with oligopoly. The whole theory of the oligopoly is that, as Justice Souter noted, they can kind of live a life that allows them to decide how they want to undertake their interactions. Plaintiffs plead oligopoly, but then their theory of rational behavior is that they should only be competing on share. They should not be competing on profitability, and that's where their logic breaks down. I want to say a few words, Your Honor, about the legal standard and then move to some really, really vivid examples of how the complaint is its own worst enemy. It starts with pleading oligopoly, and that's where it ends. Before I go there, when you go through the complaint, which is in the excerpts of the record, ask yourself, what's the it of the conspiracy? The complaint conflates supply, output, production capacity, and capital expenditures. It goes all over the place. So what did they agree to do? I'm going to talk about in a minute about what the complaint says about output. Let me ask you this, not at the moment what did they agree to do, but what did they do? They all reduced production and putting on the market, and the consequence was that they all made a lot more money than they'd previously made. Well, Your Honor, what they did was the complaint clearly alleges that output expanded measured by bits. The most common measure of output, which the complaint acknowledges, is bits. No, no, you're missing my point. The demand goes up at a certain rate. Their production goes up at a lesser rate, and they all make a lot of money. Even though they have the capacity to produce more than they're producing, as is clearly evidenced, once the Chinese lean on Samsung, and Samsung all of a sudden produces more, the prices come down again. Well, Your Honor, the complaint does not allege facts that production overall went down. What the complaint does allege, and this is… Wait a minute. Are you deliberately misunderstanding what I'm saying? Production went up, but it did not go up as fast as demand. That is correct. That is correct, Your Honor. Make sure you understand what I'm telling you, please. I apologize, but that is correct. The whole theory of the case is that while bit production increased, it didn't increase fast enough. And they say, and look, they made a lot of money. How is making a lot of money irrational? I want to go, Your Honor, if I may, to several really key allegations. Excerpt of the record at 66, paragraph 105 to 106, the complaint admits that in the pre-conspiracy period, supply exceeded demand. It admits that, that the producers got that measurement wrong. What else do they admit? In excerpt of the record 35 and 36, paragraph 110, they admit in the conspiracy period, demand was rising. They quote a Reuters report, ER 94, paragraph 187, that there was soaring demand. So the two time periods, you had excess supply in the pre-period. You had excess demand in the conspiracy period. They weren't at all comparable. What else do the plaintiffs plead? They squarely plead oligopoly, that concentration grew. This is opening brief 32. Defendants monitored each other's plans. This is excerpt of the record 70, and that the market is highly concentrated. They plead growth throughout the class period measured by bits. What else do they admit? That to the extent wafer production shrank somewhat during the period, they give us a lawful reason why. Excerpt of the record 34, paragraph 17, says that there was a change in some of the production lines to the 1X process node, which allowed the companies to produce more bits. They were upgrading. So some lines were taken down. The complaint is pleading that. So insofar as they think wafers, which it's not clear they do think is the proper it of the conspiracy, they give us the reason why. What else does the complaint plead? Both prior to the conspiracy period, as your honor noted in late 2015, Samsung noted it wanted to take some. It was going to inventory some product because it wanted to have a business model that work towards profitability. All the parties are quoted before the conspiracy period and during it as saying, I want to produce in on a par with or in line with demand. How is that irrational for a producer of shoes to say, I want to produce as many shoes that accord and are commensurate with demand. That is rational and prudent business behavior. And recall back to the point about the signaling. These are all the Qs and As. All the so-called signaling is occurring in response to questions that analysts of financial firms are putting to the producers. Why? Because the markets have an obligation to know before they invest in a company is a company being prudently run. And I want to know that you're only producing product that meets demand. Really, really importantly, at the height of the alleged conspiracy in May 2017, the complaint quotes Mr. Chun from Samsung saying Samsung would add capacity to compensate for wafer loss due to the technology migration that the complaint pleads. This is excerpt of the record at 080 paragraph 153. So the third point I'd make to you, both before the alleged conspiracy and during it, the plaintiffs are pleading rational behavior as Judge White. Rational behavior at one level, not taking into consideration legalities is, of course, to make money. So you keep saying rational. That's not the same. That's not synonymous with legal. I mean, honestly, things that will make money for them. And in that sense, it's perfectly rational. But is it legal? Well, and the answer is yes, Your Honor, because it's consistent with oligopoly behavior. Justice Souter talks about in the Twombly case, how the Ilex, the local bell companies, one of the allegations there was they didn't invade one another's technology areas, local areas. This is 550 US at 551 and also 569. And that's all in Twombly. It's also made very clear in Judge Lynch's opinion at the district court. Yes, that's right. Let me ask a question at this point, because I believe that the posture of this case is it's correct that this is a situation where the district court concluded there was parallel conduct that explained the behavior. And therefore, the plaintiffs under the standard here for an antitrust case had to demonstrate that the plus factors could could be demonstrate choreographed collusive behavior. But if they also could be explained by lawful unchoreographed free market behavior, plaintiff has asserted that if that's a competition and they could be read either way, they're entitled in a motion to dismiss for the inference. And I don't think that's correct. I think if we're back at a balance where there is legitimate free market unchoreographed behavior that could explain these plus factors. They don't get the benefit that they're alleging well they could also be choreographed illegal behavior. What's your position on that? That's exactly right, Your Honor. And that's what Judge White found. It's really important to note that while plaintiffs have a list of grievances with Judge White, he gave them what they wanted. He engaged in a holistic analysis as continental law requires you don't dismember. And he said they don't have to show they don't have to have allegations that need need not exclude the possibility of independent conduct. The standard is does it tend to exclude. So he hewed to the lower standard. He did not apply a probability standard. He didn't say your explanation plaintiff has to be more plausible than than defendants. They are squarely. They've pled oligopoly, which means is it follow the leader, the gas station copying one another insofar as there's a congruence of behavior. Our footnote nine, by the way, Your Honor, we dispute the idea there was parallel behavior. It's over seven months. Some is capacity. Some is bits. When you ask yourself, what's the it, you'll have a hard time identifying it. So you're absolutely right. They are. Judge White applied a holistic analysis as he's required to that he applied eight plus factors, only three of which he said weekly favored the plaintiffs weekly. And he said you haven't tended to exclude the possibility of independent conduct. Well, normally this court musical instruments say, how do I get to plausible plausibility. The you got to go through the filter on are there facts that taken as true tend to exclude independent conduct, or is it equally consistent with it. So they're really arguing by label, Your Honor, where they're saying he applied a probabilistic standard he didn't the really the, the, your, the reference to the star case is a red herring. This is not plausibility against plausibility of course in that situation, plaintiff wins, they've never gotten beyond nearly plausible nearly possible. And that's the problem they've done. Let me ask you this, if I may. I'm now just using just just as soon as language, some factual context, suggesting agreement we've talked about a lot of things is one of those things, the prior price fixing antitrust violation by these very same defendants, or whether you've engaged in conduct in the past can be a plus factor and you'll remember, Your Honor, I believe below judge white found that weekly in their favor, but it was 17 years ago it was in the early 2000s. Yeah, so it's a factor and is it also a factor, or how strong a factor might it be that they learned their lesson, but the allegation is that the lesson the lesson they learned was don't put it in writing. Well, all I can say is what the complaint pleads the complaint pleads nothing more and nothing less than gas stations, posting their prices and one deciding whether to copy, you know, the economics of two gas stations that are across the street from one another that are in a very competitive market with lots of gas stations and they're really gas stations in a much larger system. If we're talking economics, that's it. That analogy. There's no economic comparability between that example, and this example I understand the analysis, I understand the, the analogy, but as an economic matter doesn't tell you much. Well, Your Honor, let me direct, let me try to let me try to see if I can persuade you on this one. The complaint says squarely in the middle of the conspiracy period in the third quarter 2016 quote, Samsung made a unilateral decision to reduce its DRAM output. This is excerpt of the record 88 paragraph 171, then the complaint says, Q for fourth quarter 2016 following Samsung's announcement, quote, both hynix and micron responded with production cuts of their own, this is at 88 of the record paragraph 172. That is the gas station example, they're listening and watching and it's observable. Yes, but the economic situation of the two gas stations is enormously different on the economic situation of these three defendants. Well, I would agree in the sense too, but that's in the favor of the defendants, because they want a business model that works towards profitability. The plaintiffs have pleaded oligopoly, but they think they should behave like wheat farmers. Listen, I don't want to push this one too far, but the idea that this is comparable to gas stations across the street from one another when you've got a whole town full of gas stations, when these gas stations are operating industry in which they are tiny bit players. I'm afraid the analogy, it just doesn't make much economic sense to me. I understand the analogy, but it just, if that's your only argument. I'm not convinced you got a lot of other arguments but but that one, the economics is so different than the two situations that there's some seems to be just not comparable at all. Well, I believe I'm almost at a time I'd like to leave the court with one last thought. Excerpt of the record 81 paragraph 153 Samsung's Chung in May 2017 the heart of the conspiracy is quoted as quote, we will continue to invest supplementary and also investing capacity to make up for the loss that happens as we migrate to the one x node. Chung says in June, we will flexibly manage inventory, the very closely monitor the situation, hynix and micron and Samsung are all quoted as saying we want to be in line with growing with demand, how is being flexible and prudent and growing commensurate with demand so you don't overshoot the mark. How is that irrational and actions against self interest plaintiffs never say. Thank you. Perfectly rational. I know I can see that's perfectly rational. So, I wanted to ask you the same question I asked opposing counsel. Are you aware of the optronic case that came out yesterday from this court. I'm not ready your honor and I understand it's a post trial decision, but I have not read it, but it did have some language in there about what evidence is sufficient to, to have a client antitrust claim and I was just wondering if that you think that case helps you or hurt you. I would be happy to study at your honor and submit a letter, when we'll do that. If we ask if we need supplemental briefing will ask what I was just curious if either of you had read it before coming here today. I have not your honor. Okay, thank you very much. We took Mr Simmons over time. Let's put two minutes on the clock Mr Burman and see what happens. Thank you, Your Honor. I'll be less than two minutes. First of all, the court in Twombly said one of the plus factors is an unprecedented change in pricing or market characteristics. Mr Simmons is unable to give an explanation as to why in 2014 to 2016 DRAM was a highly competitive market and companies fought for market share, they fought for market share. Suddenly, in a three month period in 2016, they no longer fight for market share, and they all restrained supply. We believe that under the case law that creates a plausible nudging of a plus factor in our favor and important plus factor. The second point I want to make and to pick up on your comment on the prior criminal misconduct. Yes, it is a plus factor, and it should be considered to be a plus factor. And the thing I want to note about that is these are not only the same defendants in the same industry who had paid a tremendous fine one of the largest fines ever. That complaint was actually started by that case was started by one of my complaints. That wasn't very different from this one. And we settled those cases for hundreds of millions of dollars. And in the criminal context. Hynex actually promoted an executive who was in jail for the prior conspiracy. So it's reasonable to infer for this plus factor that this industry did not learn its lesson. That kind of impermissible character evidence and that you wouldn't be able to bring in a criminal case to say propensity that because someone had done something in the past. We should assume they've done it again and that they have not in fact learned their lesson and and and are operating independently. Well, Your Honor, we're at the pleading stage where we're drawing inferences. And so far, at least in the northern district courts in the SRAM case and the flash case. All of those courts have found it probative at the pleading stage to see if these companies were engaged in prior misconduct. And the last assumption though that you were bad before so you must be bad again there isn't really any evidence other than just saying it. Well, the courts have found that the pleading stage, it allows a plausibility inference that perhaps they got together again. That's all it is is a we're at the pleading stage. And at this stage, I submit to the court. The defendant had to show that our allegations of plus factors were in plausible impossible that's the word of the case law. They haven't done that. At best, there was a tie. I don't even think there was a tie, but clearly under the pleading standards and musical instruments in Twombly, and in the other circuit court opinions that we presented to you from the First Circuit. Evergreen case the Second Circuit Andrew news, and the Fourth Circuit at SD three they've all reversed district courts that have placed too high of a standard at the pleading stage on antitrust complaints. And that's what happened in this case. Thank you. Okay, thank both sides for your
judges: FLETCHER, RAWLINSON, Bencivengo